## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

      WILDEARTH GUARDIANS,

      Plaintiff,

v.

      U.S. OFFICE OF SURFACE MINING, RECLAMATION AND ENFORCEMENT,
      AL KLEIN, in his official capacity as Western Regional Director of the Office of Surface
      Mining Reclamation and Enforcement, Denver, Colorado, and
      KEN SALAZAR, in his official capacity as U.S. Secretary of the Interior,

      Defendants.

---

## PETITION FOR REVIEW OF AGENCY ACTION

---

## INTRODUCTION

1.      This case, filed in accordance with D.C.Colo.LAPR.10.2(C), involves a chronic failure of Defendants to involve the public and to address the potentially significant environmental and economic impacts of coal mining throughout the Rocky Mountain West in accordance with Federal law.

2.      At issue is the approval of "Mining Plans," which authorize the development of federally owned coal.  The Mineral Leasing Act of 1920, as amended ("MLA"), 30 U.S.C. § 181 et seq., and the Surface Mining Reclamation and Control Act ("SMCRA") of 1977, 30 U.S.C. § 1201 et seq., require the Secretary of the Interior to approve such Mining Plans as a prerequisite to the mining of federally owned coal.  Among other things, such plans must ensure that mining complies with applicable Federal laws and regulations and be based on information

prepared in compliance with the National Environmental Policy Act ("NEPA"), 42 U.S.C. §
4231 et seq.  See 30 C.F.R. § 746 et seq.

3.      Defendants have approved Mining Plans authorizing federal coal development in
the States of Colorado, Montana, New Mexico, and Wyoming.  In approving these plans,
Defendants show a pattern and practice of failing to comply with NEPA.  Specifically,
Defendants failed to ensure that the public was appropriately involved in the adoption of the
Mining Plans and failed to take a hard look at a number of potentially significant environmental
impacts.

4.      Accordingly, Plaintiff WildEarth Guardians alleges that the U.S. Office of
Surface Mining Reclamation and Enforcement and Al Klein, serving in his official capacity as
Western Regional Director of the U.S. Office of Surface Mining Reclamation and Enforcement
(collectively "OSM") violated NEPA and the Administrative Procedure Act ("APA"), 5 U.S.C.
§§701 et seq., by unlawfully approving mining plans for the Colowyo and Trapper Mines in
Colorado; the Spring Creek Mine in Montana; the San Juan Mine in New Mexico; and the
School Creek, Black Thunder, and Cordero Rojo Mines in Wyoming.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal
question), 1346 (United States as a defendant), 2201 (declaratory relief), and 2202 (injunctive
relief).  Plaintiff's claims arise under the judicial review provision of the APA, 5 U.S.C. §§ 701-
706.  This Court has jurisdiction to grant Plaintiff's attorneys' fees and costs pursuant to the
Equal Access to Justice Act, 28 U.S.C. § 2412.

6.      An actual and present controversy exists between the parties within the meaning
of the Declaratory Judgment Act, 28 U.S.C. § 2201.

7.     Venue is proper in this judicial district under 28 U.S.C. § 1391(e)(2) because "a substantial part of the events or omissions giving rise to the claim" took place at Defendant OSM's Western Regional Office in Denver, Colorado.  Defendant Al Klein is the director of OSM's Western Regional Office and, in that capacity, recommended to the U.S. Secretary of the Interior approval of the Mining Plans challenged herein.

## PARTIES

8.     Plaintiff WILDEARTH GUARDIANS is a non-profit membership organization based in Santa Fe, New Mexico, with offices in Denver and Tucson.  WildEarth Guardians ("Guardians") has more than 5,000 members, some of whom live, work, and/or recreate on public and private lands around the mines that are the subject of this Complaint.  Guardians and its members are dedicated to protecting and restoring the wildlife, wild places, and wild rivers of the American West.  Towards this end, Guardians and its members work to replace fossil fuels with clean, renewable energy in order to safeguard public health, the environment, and the Earth's climate.

9.     Guardians' members who live, work, recreate, and conduct other activities on public and private lands, including lands affected by the mining plan approvals challenged herein, are affected by poor air quality associated with coal mining in Colorado, New Mexico, Montana, and Wyoming, and have a substantial interest in ensuring they breathe the cleanest air possible.  Guardians and its members also have substantial interests in intact ecosystems free from permanent contamination of riverine habitats that destroy fish populations.  Guardians and its members use and enjoy public and private lands, and natural resources, including lands and natural resources affected by the mining plan approvals challenged herein, for recreational, scientific, aesthetic, conservation and other public purposes, and are harmed by the aesthetic and

environmental impacts of coal mining there.  Guardians and its members also have a substantial interest in ensuring that the Federal Defendants comply with Federal law, including the requirements of NEPA.  Guardians' and its members' interests have been, are being, and will continue to be irreparably harmed by Federal Defendants' approvals of the mining plans challenged herein that will further degrade the air quality in Colorado, New Mexico, Montana, and Wyoming.

10.     Defendant U.S. OFFICE OF SURFACE MINING, RECLAMATION AND ENFORCEMENT ("OSM") is a Federal agency within the United States Department of Interior. OSM is responsible for making recommendations to the Secretary of the Interior as to whether or not he should approve Mining Plans.  OSM's Western Regional Office that recommended the Secretary approve the Mining Plans challenged herein is located in Denver, Colorado.  All mining plan approval decisions challenged herein, and any required NEPA analysis that should have been conducted, took place and/or were authorized by OSM officials sitting in Denver, Colorado.

11.     Defendant AL KLEIN is sued in his official capacity as Western Regional Director of OSM.  In this capacity, he is responsible for ensuring that OSM makes legally adequate recommendations to the Secretary of Interior as to whether or not Mining Plans should be approved.  He is also the official responsible for ensuring agency compliance with NEPA and other Federal laws that apply to approval of mining plans and mining plan modifications.  Mr. Klein is based at OSM's Western Regional Office in Denver, CO.  Mr. Klein recommended for approval all of the mining plans challenged herein.

12.     Defendant KEN SALAZAR is sued in his official capacity as U.S. Secretary of the Interior.  In this capacity he is responsible for approving, disapproving, or conditionally

approving Mining Plans and Mining Plan modifications pursuant to the Mineral Leasing Act, 30

U.S.C. § 207(c) and the Surface Mining Reclamation and Control Act, 30 U.S.C. § 1273(c).

## LEGAL BACKGROUND

### I.    The Mineral Leasing Act and Surface Mining Reclamation and Control Act

13.    Under the MLA, the Secretary of Interior has two primary responsibilities

regarding the disposition of federally owned coal.

14.    First, the Secretary is authorized to lease federal coal resources, where

appropriate.  See 30 U.S.C. §§ 181 and 201.  A coal lease must be in the "public interest" and

include such "terms and conditions" as the Secretary of the Interior shall determine.  30 U.S.C.

§§ 201 and 207(a); see also 43 C.F.R. §§ 3425.1-8(a) and 3475.1.  A coal lease is issued "for a

term of twenty years and for so long thereafter as coal is produced annually in commercial

quantities[.]"  30 U.S.C. § 207(a) and 43 C.F.R. § 3475.2.  The U.S. Bureau of Land

Management ("BLM"), an agency within the Interior Department, is largely responsible for

implementing the Secretary's coal leasing responsibilities.

15.    The second responsibility of the Secretary of the Interior is to authorize, where

appropriate, the mining of federally owned coal that has been leased through a Mining Plan.  The

authority to issue a Mining Plan is set forth under the MLA, which states that before any entity

can take action on a leasehold that "might cause a significant disturbance of the environment," an

operation and reclamation plan must be submitted to the Secretary of the Interior for approval.

30 U.S.C. § 207(c).  Referred to as a "Mining Plan" by SMCRA and its implementing

regulations, the Secretary "shall approve or disapprove the [mining] plan or require that it be

modified."  30 U.S.C. § 1273(c) and 30 C.F.R. § 746.14.  It is standard practice for the Assistant

Secretary of the Interior for Land and Minerals Management to sign such Mining Plans on behalf of the Secretary.

16.     Although under SMCRA states have largely been delegated authority to regulate surface coal mining activities, the law prohibits the Secretary of Interior from delegating to states the duty to approve, disapprove, or modify Mining Plans for federally owned coal.  See 30 U.S.C. § 1273(c); see also 30 C.F.R. § 745.13(i).  Also, SMCRA prohibits the Secretary from delegating authority to states to comply with NEPA and other federal laws and regulations other than SMCRA with regards to the regulation of federally owned coal resources.  30 C.F.R. § 745.13(b).

17.     Among other things, a Mining Plan must, at a minimum, assure compliance with applicable requirements of Federal laws, regulations, and executive orders, and be based on information prepared in compliance with NEPA.  See 30 C.F.R. § 746.13.  A legally compliant Mining Plan is a prerequisite to an entity's ability to mine leased federal coal.  Regulations implementing SMCRA explicitly state that, "[n]o person shall conduct surface coal mining and reclamation operations on lands containing leased Federal coal until the Secretary has approved the mining plan."  30 C.F.R. § 746.11(a).  To this end, a Mining Plan is "binding on any person conducting mining under the approved mining plan."  30 C.F.R. § 746.17(b).

18.     Although the Secretary of Interior is charged with approving, disapproving, or modifying a Mining Plant, the Office of Surface Mining, Reclamation and Enforcement ("OSM"), an agency within the Department of Interior, is charged with "prepar[ing] and submit[ting] to the Secretary a decision document recommending approval, disapproval or conditional approval of the mining plan[,]"  30 C.F.R. § 746.13.  Thus, OSM plays a critical role in adequately informing the Secretary of Interior.

19.     A "mining plan shall remain in effect until modified, cancelled or withdrawn[.]" 30 C.F.R. § 746.17(b).  The Secretary must modify a Mining Plan where, among other things, there is "[a]ny change in the mining plan which would affect the conditions of its approval pursuant to Federal law or regulation[,]" "[a]ny change which would extend coal mining and reclamation operations onto leased Federal coal lands for the first time[,]" or "[a]ny change which requires the preparation of an environmental impact statement under the National Environmental Policy Act[.]"  30 C.F.R. §§ 746.18(a), (d)(1), (d)(4), and (d)(5).

## II.     The National Environmental Policy Act

20.     NEPA aims to "encourage productive and enjoyable harmony between man and his environment" and to promote government efforts "which will prevent or eliminate damage to the environment."  42 U.S.C. § 4321.  As Council on Environmental Quality ("CEQ") regulations implementing NEPA explain, the law "is our basic national charter for protection of the environment."  40 C.F.R. § 1500.1(a).

21.     Under NEPA, a federal agency must prepare an environmental impact statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C)(i); 40 C.F.R. § 1501.4.  In the EIS, the agency must, among other things, rigorously explore and objectively evaluate all reasonable alternatives, analyze and assess all direct, indirect, and cumulative environmental effects, and include a discussion of the means to mitigate adverse environmental impacts.  See 40 C.F.R. §§ 1502.14 and 1502.16.

22.     Direct effects include those that "are caused by the action and occur at the same time and place."  40 C.F.R. § 1508.8(a).  Indirect effects include effects that "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b).  Cumulative effects are "the impact on the environment which results

from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions."  40 C.F.R. § 1508.7.

23.    An agency may also prepare an Environmental Assessment ("EA") to determine whether an EIS is necessary.  40 C.F.R. §§ 1501.3, 1508.9.  An EA must include a discussion of alternatives and the environmental impacts of the action.  40 C.F.R. § 1508.9.

24.    If an agency decides not to prepare an EIS, an EA must "provide sufficient evidence" to support a Finding of No Significant Impact ("FONSI").  40 C.F.R. § 1501.4(e). Such evidence must demonstrate that the action "will not have a significant effect on the human environment[.]"  40 C.F.R. § 1508.13.  An assessment of whether or not an impact is "significant" is based on a consideration of the "context and intensity" of the impacts.  40 C.F.R. § 1508.27.  "Context" refers to the scope of the proposed action, including the interests affected. 40 C.F.R. § 1508.27(a).  "Intensity" refers to the severity of the impact and must be evaluated with a host of factors in mind, including "[t]he degree to which the proposed action affects public health or safety" and "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment."  40 C.F.R. § 1508.27(b).

25.    Where a decision is issued based on an EIS, the federal agency must prepare a "public record of decision" ("ROD").  40 C.F.R. § 1502.2.  An ROD must "state what the decision was," "[i]dentify all alternatives considered," and "[s]tate whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and if not, why they were not."  40 C.F.R. §§ 1502.2(a)-(c).

26.     An agency may adopt all or a portion of an EIS "provided that the statement or portion thereof meets the standards for an adequate statement" under the NEPA regulations.  40 C.F.R. § 1506.3(a).

27.     Federal agencies must "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures."  40 C.F.R. § 1506.6(a).  To the fullest extent possible, agencies must "[e]ncourage and facilitate public involvement in decisions which affect the quality of the human environment."  40 C.F.R. § 1500.2(d).  At a minimum, agencies must "[p]rovide public notice of....the availability of environmental documents so as to inform those persons and agencies who may be interested or affected."  40 C.F.R. § 1506.6(b). "Environmental documents" include EAs, EISs, FONSIs, and notices of intents to prepare and/or consider EISs.  40 C.F.R. § 1508.10.  The NEPA regulations stress that "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken" and that "public scrutiny [is] essential to implementing NEPA."  40 C.F.R. § 1500.1(b).

28.     Where "significant new circumstances or information relevant to environmental concerns and bearings on" an action or impacts analyzed in an EIS or EA arise(s), an agency "shall" prepare a supplement to the NEPA document.  40 C.F.R. § 1502.9(c)(1).  A supplement to an EIS "shall" generally be "prepare[d], circulate[d], and file[d]" in the same fashion as an EIS.  40 C.F.R. § 1502.9(c)(4).

III.     **Department of Interior and Related NEPA Regulations and Directives**

29.     In 2008, the U.S. Department of Interior ("Interior") promulgated regulations to implement NEPA.  See 73 Fed. Reg. 61292 (Oct. 15, 2008); see also 43 C.F.R. § 46 et seq. Interior and its agencies must use these regulations "in conjunction with and supplementary to"

authorities set forth under the NEPA regulations.  Id.  Prior to the adoption of these regulations,

Interior promulgated guidance in 2004 to implement NEPA in its Departmental Manual ("DM")

at 516 DM, Chapters 1-7 (hereafter referred to as the "2004 516 DM").  See 69 Fed. Reg. 10866

(March 8, 2004).  Although the 2008 regulations superseded the 2004 516 DM, the 2008

regulations and the 2004 guidance are similar in substance.

      30.    Interior's NEPA regulations, as well as the 2004 516 DM, explain that adoption

of both EISs and EAs are allowed.  See 43 C.F.R. § 46.120; see also 2004 516 DM 3.6.

However, the regulations make clear that where an EIS or EA is adopted, the agency must

determine "with appropriate supporting documentation, that it adequately assesses the

environmental effects of the proposed action and reasonable alternatives."  43 C.F.R. §

46.120(c); see also 2004 516 DM 3.6(A) (stating that an EA can be adopted if it complies with

the NEPA regulations).  Such supporting documentation "must include an evaluation of whether

new circumstances, new information or changes in the action or its impacts not previously

analyzed may result in significantly different environmental effects."  Id.

      31.    Interior's NEPA regulations also explicitly require that the public be notified "of

the availability of an environmental assessment and any associated finding of no significant

impact once they have been completed."  43 C.F.R. § 46.305(c); see also 2004 516 DM 3.3(A)

(citing 40 C.F.R. § 1606.6 and stating that "[t]he public must be provided notice of the

availability of EAs[.]").

      32.    The current version of Interior's Departmental Manual also sets forth NEPA

implementing procedures specific to OSM.  OSM is the agency charged with making

recommendations to the Secretary of the Interior as to the approval, disapproval, or modification

of Mining Plans in accordance with 30 C.F.R. § 746.13.  See 516 DM 13.  Chapter 13 of the

Manual sets forth categories of actions that normally require the preparation of an EIS.  516 DM 13 at 13.4.

33.     Among other things, the Departmental Manual explains that where approval of a Surface Mining Plan involves "environmental impacts [that] are not adequately analyzed in an earlier environmental document covering the specific leases or mining activity," where "[t]he area to be mined is 1280 acres or more, or the annual full production level is 5 million tons or more," and where  "[m]ining and reclamation operations will occur for 15 years or more," an EIS is normally required.  516 DM 13.4(A)(4).  Where an action is one that normally requires preparation of an EIS and a decision is made not to prepare an EIS, the FONSI must be made available for public review for 30 days prior to a decision in accordance with 40 C.F.R. § 1501.4(e)(2).  516 DM 13.4(B).

34.     OSM also adopted its own directives to implement NEPA.  See OSM Handbook on Procedures for Implementing the National Environmental Policy Act ("OSM NEPA Handbook").  These directives emphasize that OSM may adopt NEPA documents produced by other agencies.  If OSM does so, the agency must "ensure that the findings of the documents are in full compliance with NEPA and OSM policy."  OSM NEPA Handbook, Chapter 3 § B.1. Where an EIS is adopted, OSM's directives state that the agency should publish a "notice of intent to adopt" in the Federal Register.  OSM Handbook, Chapter 3 § B.3.a.  The directives state that "[a] ROD is prepared for all actions involving an EIS."  OSM Handbook, Chapter 3 § B.3.c.

**IV.    The Administrative Procedure Act**

35.     The APA provides a right to judicial review for any "person suffering legal wrong because of agency action."  5 U.S.C. § 702.  Actions that are reviewable under the APA include final agency actions "for which there is no other adequate remedy in a court."  Id.

36.     Under the APA, a reviewing court shall "hold unlawful and set aside agency action...found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

## FACTUAL BACKGROUND

## I.     Environmental Impacts of Coal Mining

37.     Coal is mined with the express purpose of combusting it as fuel.  In the United States the majority of coal mined is burned as fuel for power plants.  According to the U.S. Energy Information Administration ("EIA"), 90% of all coal mined in the U.S. is used for electricity generation.  See EIA, "What is the role of coal in the United States?" http://www.eia.gov/energy_in_brief/role_coal_us.cfm (last accessed Feb. 26, 2013).  According to the EIA, the use of coal as a source of electricity has declined since 2007.  See id.

38.     In the States of Colorado, Montana, New Mexico, and Wyoming, both surface and underground mining techniques are used to extract coal.  Within these states, coal is mined primarily to fuel adjacent or nearby power plants, although in some cases it may be shipped to other power plants in the nation, or possibly even internationally.  In the northeastern portion of Wyoming and southeastern portion of Montana, a region called the Powder River Basin, coal is mined to fuel hundreds of power plants in more than 30 states.  The Powder River Basin is the largest coal-producing region in the United States.

39.     Depending on the mining technique, mining operations can include, but are not limited to, the use of heavy equipment, including diesel-powered trucks and other vehicles, on-site electricity generation, the stripping of overburden, topsoil removal and storage, blasting, construction of ventilation shafts, the drilling and operation of methane drainage wells, coal processing facilities, crushers, conveyors, construction and operation of coal storage silos and

piles, coal load-out facilities, construction and maintenance of stormwater control facilities

and/or other water quality-related facilities, reclamation, waste disposal, road construction,

monitoring well construction, dewatering of ground water, and other activities.  In some cases,

coal ash from combustion is used as fill and disposed of at mines.

40.     The direct impacts of both underground and surface coal mining include air

quality impacts, water quality impacts, fish and wildlife impacts, and alteration of landscapes and

scenic views.  Indirectly, coal mining leads to environmental impacts associated with coal

transport and coal combustion.  Such indirect impacts can include, but are not limited to, air

pollution impacts from diesel-powered locomotives hauling coal trains, coal dust impacts from

coal trains or other transportation methods, air and waster pollution impacts from coal-fired

power plants, and waste disposal (i.e., coal ash waste disposal) impacts associated with the

operation of coal-fired power plants and other facilities that burn coal.

41.     In the States of Colorado, Montana, New Mexico, and Wyoming, air pollution

from coal mining directly and indirectly affects air quality.  Emissions from coal mining include

ozone precursors, particulate matter, and nitrogen dioxide.

42.     The U.S. Environmental Protection Agency ("EPA") sets health and welfare-

based National Ambient Air Quality Standards ("NAAQS") for air pollutants in accordance with

Section 109 of the Clean Air Act.  See 42 U.S.C. §§ 7409(a).  EPA is required to establish

NAAQS to ensure that pollution concentrations in the air that the public breathes are limited to

the levels requisite to protect health and welfare with an adequate margin of safety.  See 42

U.S.C. § 7409(b).

43.     Ozone is a criteria pollutant under the Clean Air Act, 42 U.S.C. § 7408.  Pursuant

to the Clean Air Act, in 1997 EPA established a NAAQS for ozone at 0.080 parts per million

("ppm") over an eight-hour period.  62 Fed. Reg. 38,856 (July 18, 1997).  On March 27, 2008,

EPA published a final rule for a new ozone NAAQS that significantly lowered the 8-hour

standard to 0.075 ppm.  73 Fed. Reg. 16,436 (March 27, 2008).  This new ozone standard

became effective on May 27, 2008, superseding the prior ozone NAAQS as of that time.  Id.

Ozone forms when two pollutants—volatile organic compounds and nitrogen oxides—react with

sunlight.  EPA has stated that the latest scientific evidence on ozone effects "is highly suggestive

that [ozone] directly or indirectly contributes to non-accidental and cardiorespiratory-related

mortality," including "premature mortality."  Id. at 16,443-46.

44.     Particulate matter less than 2.5 microns in diameter, or $PM_{2.5}$, is a criteria

pollutant under the Clean Air Act.  42 U.S.C. § 7408.  In 1997, EPA promulgated two standards

for $PM_{2.5}$: an annual NAAQS of 15 micrograms per cubic meter ("$\mu g/m^3$") and a 24-hour NAAQS

of 50 $\mu g/m^3$.  62 Fed. Reg. 38,652, 38,655 (July 18, 1997).  In 2006, EPA lowered the 24-hour

$PM_{2.5}$ standard to 35 $\mu g/m^3$.  71 Fed. Reg. 61,144 (Oct. 17, 2006).  Health risks associated with

exposure to $PM_{2.5}$ include "premature mortality, aggravation of respiratory and cardiovascular

disease [and] changes in lung function and increased respiratory symptoms."  Id. at 61,152.

45.     $NO_2$ is a criteria pollutant under the Clean Air Act. 42 U.S.C. § 7408.  The $NO_2$

annual standard is 53 parts per billion ("ppb").  On July 15, 2009, EPA proposed to supplement

the annual standard with a one-hour $NO_2$ standard of between 80 and 100 ppb.  74 Fed. Reg.

34,404-66 (July 15, 2009).  EPA believed it was necessary to supplement the annual standard

with a standard governing short-term exposure because "recent studies provide scientific

evidence that is sufficient to infer a likely causal relationship between short-term $NO_2$ exposure

and adverse effects on the respiratory system."  Id. at 34,410.  According to EPA,

"[e]pidemiologic evidence exists for positive associations of short-term ambient $NO_2$

14

concentrations below the current NAAQS with increased numbers of emergency department visits and hospital admissions for respiratory causes, especially asthma." Id. at 34,413.  EPA promulgated the final one-hour $NO_2$ standard of 100 ppb on February 9, 2010.  75 Fed. Reg. 6,474 (Feb. 9, 2010).

46.     Air pollution that includes ozone precursors, $PM_{2.5}$, and $NO_2$ can be released from coal mining in many ways and impact ambient air quality in the context of relevant federal health and welfare standards. Diesel exhaust can produce $PM_{2.5}$ and $NO_2$.  Methane venting and general ventilation from underground mines can release volatile organic compounds, which react with sunlight to form ozone.  Stripping and blasting can produce $PM_{2.5}$.  Blasting can produce $NO_2$ emissions.

47.     Indirectly, coal-fired power plants and other industrial activities that rely on coal for fuel can release large amounts of air pollution and impact ambient air quality on local and regional scales.  The burning of coal can release $PM_{2.5}$, volatile organic compounds, $NO_2$, and a host of other harmful air pollutants.  Truck or train transportation methods can also produce $NO_2$, volatile organic compounds, and $PM_{2.5}$.

48.     Coal mining and combustion also release mercury and selenium.  Even small concentrations of these pollutants can degrade water quality and jeopardize aquatic species.  The U.S. Fish and Wildlife Service ("USFWS") has found selenium to be one of the most toxic elements to fish, causing adverse effects to reproduction.  The USFWS also found that fish ingesting very small amounts of mercury can experience reproductive impairment, behavioral changes, and brain damage.

49.     The air, water, and biodiversity impacts associated with coal transport and combustion are reasonably foreseeable indirect impacts associated with coal mining.  These

indirect impacts are relevant as to whether or not the overall impacts associated with coal mining are significant.  An understanding and disclosure of such impacts is relevant to ensuring reasoned and well-informed decisions under NEPA.

## II.   Mining Plan Approvals

50.   In 2007, the Secretary of the Interior approved a Mining Plan modification for the Colowyo Mine in Colorado.

51.   In 2009, the Secretary of the Interior approved a Mining Plan modification for the Trapper Mine in Colorado.

52.   In 2012, the Secretary of the Interior approved a Mining Plan modification for the Spring Creek Mine in Montana.

53.   In 2008, the Secretary of the Interior approved a Mining Plan modification for the San Juan Mine in New Mexico.

54.   In 2010, the Secretary of the Interior approved a new Mining Plan for the School Creek Mine in Wyoming.

55.   In 2011, the Secretary of the Interior approved a Mining Plan modification for the Black Thunder Mine in Wyoming.

56.   In 2012, the Secretary of the Interior approved a Mining Plan modification for the Cordero Rojo Mine in Wyoming.

57.   These Mining Plan approvals in ¶¶ 50-56 authorized the mining of federal coal. This federal coal will be used for combustion in power plants and other industrial sources.

58.   All of the Mining Plan approvals in ¶¶ 50-56 fail to meet NEPA's public notification requirements, and fail to adequately consider potentially significant direct and indirect environmental impacts in accordance with NEPA.  These deficiencies contradict NEPA,

CEQ regulations implementing NEPA, Interior Department regulations implementing NEPA, and OSM directives.  The Mining Plan approvals at issue, and the relevant factual background related to these approvals, are as follows:

      **A.**      <u>**Colorado Mining Plan Approvals**</u>

             *1.*      *2007 Colowyo Mining Plan Approval*

59.      On June 15, 2007, the Secretary issued a Mining Plan modification to Colowyo Coal Company for the mining of federally owned coal at the Colowyo Mine in Colorado (hereafter referred to as the "2007 Colowyo Mining Plan approval").  The Assistant Secretary of the Interior for Land and Minerals signed the 2007 Colowyo Mining Plan approval.  The 2007 Colowyo Mining Plan approval authorized mining activities at the Colowyo Mine in Moffat and Rio Blanco Counties, Colorado related to Federal Coal Leases C-0123476, C-29225, and C-29226.

60.      The 2007 Colowyo Mining Plan approval authorized surface mining, a production rate of up to nine million tons per year, and ultimately recovery of an additional 43.0 million tons of coal from 5,219 acres.  Under the decision, the life of the mine would continue for an additional 11 years.

61.      On May 8, 2007, OSM issued a FONSI for the 2007 Colowyo Mining Plan approval.  OSM did not provide public notice of the FONSI.  According to OSM, the FONSI relied entirely on a supplemental EA prepared by OSM in 2007.  OSM did not provide public notice of the supplemental EA.  The Assistant Secretary of the Interior relied on OSM's FONSI when he approved the 2007 Colowyo Mining Plan.

62.      OSM's 2007 supplemental EA does not analyze a number of potentially significant direct impacts.  The supplemental EA asserts to supplement NEPA documents

prepared in 1975, 1977, 1979, 1980, 1989, 1992, and 2001.  The EA asserts that, with the exception of impacts to wildlife and cultural resources, these NEPA documents adequately analyzed the impacts of mining at the Colowyo Mine.

63.    Neither OSM's 2007 supplemental EA nor the 1975, 1977, 1979, 1980, 1989, 1992, and 2001 NEPA documents analyze impacts to air quality, including impacts to NAAQS for $PM_{2.5}$ and ozone.  EPA adopted the NAAQS for $PM_{2.5}$ in 1997 and revised the $PM_{2.5}$ NAAQS in 2006.  EPA adopted the NAAQS for ozone in 1997 and revised the ozone NAAQS in 2008.

64.    OSM's 2007 supplemental EA does not provide any evidence for the conclusion that operation of the mine will not significantly impact air quality with respect to $PM_{2.5}$ and ozone.  The 1975, 1977, 1979, 1980, 1989, 1992, and 2001 NEPA documents do not contain any evidence to support a conclusion that operation of the mine will not significantly impact air quality with respect to $PM_{2.5}$ and ozone.

65.    Additionally, neither OSM's 2007 supplemental EA nor the 1975, 1977, 1979, 1980, 1989, 1992, and 2001 NEPA documents analyze the potentially significant indirect impacts to air and water quality associated with combustion of the coal mined from the Colowyo Mine.

66.    OSM's 2007 EA is inadequate and violates NEPA because it relied upon and tiers to outdated and insufficient documents completed well before the most recent air quality standard for $PM_{2.5}$ promulgated by EPA in 2006.  OSM's 2007 EA does not include an evaluation of the impacts of mining at the Colowyo Mine on $PM_{2.5}$ levels in light of 2006 $PM_{2.5}$ standard.  Although it predates the 2008 revision of the ozone standard, OSM's 2007 EA does not include an evaluation of the impacts of mining at the Colowyo Mine on ozone levels in light

of 1997 ozone standard that was in effect at the time OSM prepared its supplemental EA and FONSI.

67.     The Colowyo Mine provides coal for the nearby power plant in Craig, Colorado.

68.     OSM's 2007 supplemental EA and the supplemented NEPA documents do not provide any evidence to support a conclusion that the indirect impacts of coal combustion will not be significant.

69.     OSM's supplemental EA for the 2007 Colowyo Mining Plan approval fails to provide sufficient evidence to justify a FONSI.

### 2.     *2009 Trapper Mining Plan Approval*

70.     On November 27, 2009, the Secretary issued a Mining Plan modification to Trapper Mining, Inc. for the mining of federally owned coal at the Trapper Mine in Colorado (hereafter referred to as the "2009 Trapper Mining Plan approval").  The Assistant Secretary of the Interior for Land and Minerals signed the 2009 Trapper Mining Plan approval.  The 2009 Trapper Mining Plan approval authorized mining activities at the Trapper Mine in Moffat County, Colorado related to Federal Coal Leases C-07519 and C-079641.

71.     The 2009 Trapper Mining Plan approval authorized surface coal mining, a production rate of up to 2.6 million tons per year, and ultimately recovery of 17.4 million tons of coal from 10,382.3 acres.  Under the decision, the life of the mine would continue for an additional 11 years.

72.     On October 26, 2009, OSM issued a FONSI for the 2009 Trapper Mining Plan approval.  OSM did not provide public notice of the FONSI.  According to OSM, the FONSI relied entirely on a supplemental EA prepared by OSM in 2009.  OSM did not provide public

notice of its supplemental EA.  The Assistant Secretary of the Interior relied on OSM's FONSI

when he signed the 2009 Trapper Mining Plan approval.

73.     OSM's 2009 supplemental EA does not adequately analyze a number of

potentially significant direct impacts to the environment.  OSM's 2009 supplemental EA asserts

to supplement NEPA documents prepared by other agencies in 1974, 1977, 1979, 1982, 1983,

and 1988.  The EA asserts that, with the exception of impacts to wildlife and cultural resources,

these NEPA documents adequately analyzed the impacts of mining at the Trapper Mine.

74.     Neither OSM's 2009 supplemental EA nor the 1974, 1977, 1979, 1982, 1983, and

1988 NEPA documents analyze impacts to air quality, including impacts to NAAQS for $PM_{2.5}$

and ozone.  These NAAQS include standards for $PM_{2.5}$, which EPA revised in 2006, and

standards for ground-level ozone, which EPA revised in 2008.

75.     OSM's 2009 supplemental EA does not provide any evidence for the conclusion

that operation of the Trapper Mine will not significantly impact air quality with respect to $PM_{2.5}$

and ozone.  The 1974, 1977, 1979, 1982, 1983, and 1988 NEPA documents do not contain any

evidence to support a conclusion that operation of the mine will not significantly impact air

quality with respect to $PM_{2.5}$ and ozone.

76.     Additionally, neither OSM's 2009 supplemental EA nor the 1974, 1977, 1979,

1982, 1983, and 1988 NEPA documents analyze the potentially significant indirect impacts to air

and water quality associated with combustion of the coal mined from the Trapper Mine.

77.     OSM's EA is inadequate and violates NEPA because it relied upon and/or tiers to

outdated and insufficient documents completed well before the most recent air quality standards

for $PM_{2.5}$ and ozone promulgated by EPA in 2006 and 2008, respectively.  OSM's 2009 EA does

not include an evaluation of the impacts of mining at the Trapper Mine on $PM_{2.5}$ levels in light of

2006 PM$_{2.5}$ standard.  OSM's 2009 EA also does not include an evaluation of the impacts of mining at the Trapper Mine on ozone levels in light of 2008 ozone standard.

78.     The Trapper Mine provides coal for the nearby power plant in Craig, Colorado.

79.     Upon information and belief, coal ash from the Craig power plant is disposed of in the Trapper Mine.

80.     OSM's 2009 supplemental EA and the supplemented NEPA documents do not provide any evidence that indirect environmental impacts related to coal combustion will not be significant.

81.     OSM's supplemental EA prepared for the 2009 Trapper Mining Plan approval fails to provide sufficient evidence to justify a FONSI.

**B.     Montana Mining Plan Approval**

   **1.     2012 Spring Creek Mining Plan Approval**

82.     On June 27, 2012, the Secretary issued a Mining Plan modification to Cloud Peak Energy for the mining of federally owned coal at the Spring Creek Mine in Montana (hereafter referred to as the "2012 Spring Creek Mining Plan approval").  The Assistant Secretary of the Interior for Land and Minerals signed the 2012 Spring Creek Mining Plan approval.  This decision authorized mining activities at the Spring Creek Mine in Big Horn County, Montana related to Federal Coal Lease MTM-94378.

83.     The 2012 Spring Creek Mining Plan approval authorized surface coal mining, a production rate of up to 24 million tons per year, and ultimately recovery of 117.3 million tons of coal from 428.3 acres.  Under the decision, the life of the mine would continue for an additional 10.9 years.

84.     On June 5, 2012, OSM issued a FONSI for the 2012 Spring Creek Mining Plan approval.  OSM did not provide public notice of the FONSI.  According to OSM, the FONSI relied entirely on an EA prepared by the BLM in 2006.  The Assistant Secretary of the Interior relied on the OSM FONSI when he signed the 2012 Spring Creek Mining Plan approval.

85.     The 2006 EA adopted by OSM and the Assistant Secretary of Interior specifically fails to analyze impacts to air quality, including impacts to NAAQS for $PM_{2.5}$, ozone, and $NO_2$. These NAAQS include the 2006 standard for $PM_{2.5}$, the 2008 standard for ground-level ozone, ad the 2010 standard for $NO_2$.

86.     The 2006 EA does not provide any evidence for the conclusion that operation of the Spring Creek Mine will not significantly impact air quality with respect to $PM_{2.5}$, ozone, and $NO_2$.

87.     The 2006 EA also does not analyze the potentially significant indirect impacts associated with combustion of the coal mined from the Spring Creek Mine, including indirect air pollution impacts, water pollution impacts, and coal ash disposal impacts.

88.     The 2006 EA is inadequate and violates NEPA because it relied upon and tiers to outdated and insufficient documents completed well before the most recent air quality standards for $PM_{2.5}$, ozone, and $NO_2$.  The 2006 EA does not include an evaluation of the impacts of mining at the Spring Creek Mine on $PM_{2.5}$ levels in light of 2006 $PM_{2.5}$ standard.  The 2006 EA also does not include an evaluation of the impacts of mining at the Spring Creek Mine on ozone levels in light of 2008 ozone standard.  The 2006 EA also does not include an evaluation of the impacts of mining at the Spring Creek Mine on $NO_2$ levels in light of 2010 $NO_2$ standard.  OSM issued its 2012 FONSI approving the Spring Creek Mine Plan Modification well after the revised

air quality standards for $PM_{2.5}$, ozone, and $NO_2$.  OSM did not supplement the 2006 EA with any

analysis of air quality impacts that took these standards into account.

89.     The Spring Creek Mine provides coal for dozens of power plants.

90.     The 2006 EA does not provide any evidence to support the conclusions that

indirect impacts related to coal combustion will not be significant.

91.     Neither the Secretary nor OSM supplemented the 2006 EA to address the

deficiencies identified in ¶¶ 79-82, 84.  Neither the Secretary nor OSM addressed the

deficiencies identified in ¶¶ 79-82, 84 in accordance with NEPA.

### C.     New Mexico Mining Plan Approval

#### 1.     2008 San Juan Mining Plan Approval

92.     On January 17, 2008, the Secretary issued a Mining Plan modification to the San

Juan Coal Company for the mining of federally owned coal at the San Juan Mine in New Mexico

(hereafter referred to as the "2008 San Juan Mining Plan approval").  The Assistant Secretary of

the Interior for Land and Minerals signed the 2008 San Juan Mining Plan approval.  The 2008

San Juan Mining Plan approval authorized mining activities at the San Juan Mine in San Juan

County, New Mexico related to Federal Coal Lease NM-99144.

93.     The 2008 San Juan Mining Plan approval authorized underground coal mining, a

production rate of up to eight million tons per year, and ultimately recovery of 36.6 million tons

of coal from 4,483.88 acres.  Under the decision, the life of the mine would be extended for an

additional 11 years.

94.     On November 19, 2007, OSM issued a FONSI for the 2008 San Juan Mining Plan

approval.  OSM did not provide public notice of the FONSI.  According to OSM, the FONSI

relied entirely on an EA prepared by the BLM in 1998, and the State of New Mexico's 1999

decision to issue a mining permit to the San Juan Coal Company pursuant to the State's delegated SMCRA authority.  The Assistant Secretary of the interior relied on OSM's FONSI when he signed the 2008 San Juan Mining Plan approval.

95.     The State of New Mexico's 1999 decision to issue a mining permit to the San Juan Coal Company pursuant to the State's delegated SMCRA authority was not prepared in compliance with NEPA.  A mining permit is not a NEPA document.  OSM cannot rely on San Juan's mining permit to support issuance of the 2008 FONSI.

96.     The 1998 EA adopted by OSM and the Assistant Secretary of Interior specifically fails to analyze impacts to air quality, including impacts to NAAQS for $PM_{2.5}$ and ozone.  EPA adopted the NAAQS for $PM_{2.5}$ in 1997 and revised the $PM_{2.5}$ NAAQS in 2006.  EPA adopted the NAAQS for ozone in 1997 and revised the ozone NAAQS in 2008.  The EA and State of New Mexico permit do not provide evidence to support a conclusion that air quality impacts will not be significant.

97.     The FONSI violates NEPA because it relied upon and tiers to outdated and insufficient documents completed well before the most recent air quality standard for $PM_{2.5}$ was promulgated by EPA in 2006.  OSM issued its 2008 FONSI approving the San Juan Mine Plan Modification well after the revised air quality standards for $PM_{2.5}$.  Although OSM's FONSI predates the 2008 revision of the ozone standard, OSM did not include an evaluation of the impacts of mining at the San Juan Mine on ozone levels in light of 1997 ozone standard that was in effect at the time OSM prepared its FONSI.  OSM did not supplement the 1998 EA with any analysis of air quality impacts that took these standards into account.

98.     The 1998 EA and 1999 State of New Mexico permit also do not analyze the potentially significant indirect impacts associated with combustion of the coal mined from the San Juan Coal Mine, including indirect air pollution impacts, water pollution impacts, and coal ash disposal impacts.

99.     The San Juan Mine provides coal for the adjacent San Juan Generating Station west of Farmington, New Mexico.

100.    The 1998 EA does not provide any evidence that indirect impacts related to coal combustion will not be significant.

101.    Neither the Secretary nor OSM supplemented the 1998 EA to address the deficiencies identified in ¶¶ 96-98, 100.  Neither the Secretary nor OSM otherwise addressed the deficiencies identified in ¶¶ 96-98, 100 in accordance with NEPA.

**D.      Wyoming Mining Plan Approvals**

***1.      2010 School Creek Mining Plan Approval***

102.    On November 24, 2010, the Secretary issued a new Mining Plan to West Roundup Resources, Inc. for the mining of federally owned coal at the School Creek Mine in Wyoming (hereafter referred to as the "2010 School Creek Mining Plan approval").  The Assistant Secretary of the Interior for Land and Minerals signed the 2010 School Creek Mining Plan approval.  The 2010 School Creek Mining Plan approval authorized mining activities at the Black Thunder Mine in Campbell County, Wyoming related to Federal Coal Lease WYW-151234, WYW-172413, and WYW-172414.  The School Creek Mine is located in the Powder River Basin of northeastern Wyoming.

103.    The 2010 School Creek Mining Plan approval authorized new surface coal mining, an increased production rate of up to 40 million tons per year, and ultimately recovery of

792 million tons of additional coal from 7,394 acres.  Under the decision, the life of the mine would be for 21 years.

104.    On October 26, 2010, OSM issued a FONSI for the 2010 School Creek Mining Plan approval.  OSM did not provide public notice of the FONSI.  According to OSM, the FONSI relied entirely upon a December 2009 EA prepared by OSM.  OSM did not provide public notice of the availability of the EA.  The Assistant Secretary relied on OSM's FONSI when he signed the 2010 School Creek Mining Plan approval.

105.    According to the Department of Interior Departmental Manual, preparation of an EIS would be required for the School Creek Mining Plan approval because impacts were not adequately analyzed in earlier environmental documents, the size of the area is greater than 1,280 acres, the production rate was more than five million tons annually, and that mining and reclamation operations will occur for more than 15 years.  OSM did not prepare an EIS for the School Creek Mining Plan.  There is no explanation in the School Creek Mining Plan approval, OSM's EA for the action, or OSM's FONSI explaining why the agency did not prepare an EIS in accordance with the Departmental Manual.

106.    OSM's 2009 EA adopted by the Assistant Secretary of Interior fails to analyze impacts to air quality, including impacts to NAAQS for $PM_{2.5}$, ozone, and $NO_2$.  These NAAQS include the 2006 standard for $PM_{2.5}$, the 2008 standard for ground-level ozone, and the 2010 standard for $NO_2$.

107.    OSM's 2009 EA does not provide sufficient evidence to support a conclusion that that air quality impacts will not be significant.  OSM's 2009 EA also does not analyze potentially significant indirect impacts associated with combustion of the coal mined from the School Creek

Mine, including indirect air pollution impacts, water pollution impacts, and coal ash disposal impacts.

108.    The School Creek Mine will likely provide coal for dozens of power plants.

109.    OSM's 2009 EA does not provide any evidence that indirect impacts related to coal combustion will not be significant.

110.    Neither the Secretary nor OSM supplemented the EA to address the deficiencies identified in ¶¶ 106-107, 109.  Neither the Secretary nor OSM addressed the deficiencies identified in ¶¶ 106-107, 109 in accordance with NEPA.

### 2.    *2011 Black Thunder Mining Plan Approval*

111.    On May 20, 2011, the Secretary issued a Mining Plan modification to Thunder Basin Coal Company, LLC for the mining of federally owned coal at the Black Thunder Mine in Wyoming (hereafter referred to as the "2011 Black Thunder Mining Plan approval").  The Assistant Secretary of the Interior for Land and Minerals signed the 2011 Black Thunder Mining Plan approval.  The 2011 Black Thunder Mining Plan approval authorized mining activities at the Black Thunder Mine related to Federal Coal Leases WYW-172692.

112.    The 2011 Black Thunder Mining Plan approval authorized surface coal mining, an increased production rate of up to 82 million tons per year, and ultimately recovery of 45.1 million tons of additional coal from 438 acres.  Under the decision, the life of the mine would continue for 22 years.

113.    On April 28, 2011, OSM issued a "Statement of NEPA Compliance" for the 2011 Black Thunder Mining Plan approval.

114.    The 2011 Statement of NEPA Compliance adopted a 2003 EIS and a 2010 EIS that were both prepared by the BLM.

27

115.    OSM did not provide public notice of the 2011 Statement of NEPA compliance. OSM did not publish a notice in the Federal Register informing the public that the agency had adopted the BLM's 2003 and 2010 EISs.

116.    The 2003 and 2010 EISs adopted by OSM and the Assistant Secretary of Interior did not analyze direct impacts to air quality, including impacts to NAAQS for $PM_{2.5}$, ozone, and $NO_2$.  These NAAQS include the 2006 standard for $PM_{2.5}$, the 2008 standard for ground-level ozone, and the 2010 standard for $NO_2$.

117.    The 2003 and 2010 EISs also did not analyze the potentially significant indirect impacts associated with combustion of the coal mined from the Black Thunder Mine, including indirect air pollution impacts, water pollution impacts, and coal ash disposal impacts.

118.    Neither the Secretary nor OSM supplemented the 2003 and 2010 EISs to address the deficiencies identified in ¶¶ 116-117.  Neither the Secretary nor OSM addressed the deficiencies identified in ¶¶ 116-117 in accordance with NEPA.

### 3.    2012 Cordero Rojo Mining Plan Approval

119.    On May 31, 2012, the Secretary issued a Mining Plan modification to Cordero Mining, LLC for the mining of federally owned coal at the Cordero Rojo Mine in Wyoming (hereafter referred to as the "2012 Cordero Rojo Mining Plan approval").  The Assistant Secretary of the Interior for Land and Minerals signed the 2012 Cordero Rojo Mining Plan approval.  The 2012 Cordero Rojo Mining Plan approval authorized mining activities at the Cordero Rojo Mine in Campbell County, Wyoming related to Federal Coal Leases WYW-154432 and WYW-174407.  The Cordero Rojo Mine is located in the Powder River Basin of northeastern Wyoming.

120.    The 2012 Cordero Rojo Mining Plan approval authorized surface coal mining, an increased production rate of up to 65 million tons per year, and ultimately recovery of 221 million tons of additional coal from 570.3 acres.  Under the decision, the life of the mine would continue for seven years.

121.    On April 16, 2012, OSM issued a "Statement of NEPA Compliance" for the 2012 Cordero Rojo Mining Plan approval.

122.    The 2012 Statement of NEPA Compliance adopted a 2007 EIS prepared by the BLM.

123.    OSM did not provide public notice of the 2012 Statement of NEPA compliance. OSM did not publish a notice in the Federal Register informing the public that the agency had adopted the BLM's 2007 EIS.  Public notice of the 2012 Statement of NEPA compliance was not provided.  Even though OSM adopted the BLM's 2007 EIS, the agency did not publish a notice of intent in the Federal Register.

124.    The 2007 EIS adopted by OSM and the Assistant Secretary of Interior fails to analyze the direct impacts to air quality, including impacts to NAAQS for $PM_{2.5}$, ozone, and nitrogen dioxide.  These NAAQS include the 2006 standard for $PM_{2.5}$, the 2008 standard for ground-level ozone, and the 2010 standard for $NO_2$.

125.    The 2007 EIS also does not analyze the potentially significant indirect impacts associated with combustion of the coal mined from the Cordero Rojo Mine, including indirect air pollution impacts, water pollution impacts, and coal ash disposal impacts.

126.    The Cordero Rojo Mine provides coal for dozens of power plants.

127.    Neither the Secretary nor OSM supplemented the 2007 EIS to address the deficiencies identified in ¶¶ 124-125.  Neither the Secretary nor OSM addressed the deficiencies identified in ¶¶ 124-125 in accordance with NEPA.

### CLAIMS FOR RELIEF

### First Claim for Relief
**Violation of NEPA with Respect to the 2007 Colowyo Mining Plan Modification—Failure to Provide Public Notice and Participation**

128.    Each and every allegation set forth in this complaint is incorporated herein by reference.

129.    Defendants approved the 2007 Colowyo Mining Plan Modification as part of an ongoing patterns and practice of taking federal action on mining plan modifications in violation of NEPA's requirement that, to the fullest extent possible, all federal agencies are obligated to "[e]ncourage and facilitate public involvement in decisions which affect the quality of the human environment."  40 C.F.R. § 1500.2.

130.    NEPA's implementing regulations require the Defendants to "(a) [m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures" and to "(b) [p]rovide public notice of NEPA-related hearings, public meetings, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected."  40 C.F.R. § 1506.6.

131.    "NEPA procedures must ensure that environmental information is available to public officials and citizens before decisions are made and before actions are taken."  40 C.F.R. § 1500.1.  NEPA's implementing regulations provide extensive public involvement requirements. 40 C.F.R. § 1506.6.

132.    Defendants violated NEPA regulations which require that a FONSI shall be made "available to the affected public" and that the public and other affected agencies shall be involved in the NEPA process.  40 C.F.R. §§ 1501.4(e)(1); 1506.6.

133.    Defendants did not provide notice to the public of the availability of OSM's FONSI and supplemental EA for the 2007 Colowyo Mining Plan modification.  OSM's failure to provide notice of the availability of the supplemental EA and FONSI violates NEPA, 40 C.F.R. §§ 1501.4(e)(1); 1506.6., and the APA, 5 U.S.C. § 706(2)(A).

**Second Claim for Relief**
**Violation of NEPA with Respect to the 2007 Colowyo Mining Plan Modification—Failure to Take a Hard Look at the Direct and Indirect Impacts of Mining on Air Quality**

134.    Each and every allegation set forth in this complaint is incorporated herein by reference.

135.    NEPA requires federal agencies to take a "hard look" at the environmental consequences of their actions.  42 U.S.C. § 4332.  NEPA's implementing regulations require Defendants to consider and assess the direct and indirect impacts of mining activities at the Colowyo Mine.  See 40 C.F.R. § 1508.25(c)(3).

136.    OSM prepared a supplemental EA for the Colowyo Mining Plan modification in 2007.  The EA supplemented seven NEPA documents previously prepared by either OSM or BLM.  The EA addressed impacts to wildlife and cultural resources from the Colowyo Mining Plan modification.  OSM's 2007 EA did not discuss direct and indirect impacts to air quality from the Colowyo Mining Plan modification.

137.    Defendants failed to prepare a NEPA document that presented the requisite hard look at direct impacts to local air quality from the Colowyo mine's $PM_{2.5}$ and ozone emissions.

OSM's 2007 EA did not address impacts to air quality in light of the 2006 $PM_{2.5}$ standard and the 1997 ozone standard that was in effect at the time OSM prepared its EA.

138.    Defendants failed to prepare a NEPA document that also presented the requisite hard look at indirect impacts to air and water quality associated with combustion of coal from the Colowyo Mine.

139.    Because Defendants' approval of the 2007 Colowyo Mining Plan modification failed to take a hard look at the direct and indirect impacts of mining, Defendants' approval was "arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law" and constitutes a violation of NEPA and the APA.  5 U.S.C. § 706(2)(A) and (D).

**Third Claim for Relief**
**Violation of NEPA with Respect to the 2009 Trapper Mining Plan Modification—Failure to Provide Public Notice and Participation**

140.    Each and every allegation set forth in this complaint is incorporated herein by reference.

141.    Defendants approved the 2009 Trapper Mining Plan Modification as part of an ongoing patterns and practice of taking federal action on mining plan modifications in violation of NEPA's requirement that, to the fullest extent possible, all federal agencies are obligated to "[e]ncourage and facilitate public involvement in decisions which affect the quality of the human environment."  40 C.F.R. § 1500.2.

142.    Defendants did not provide notice to the public of the availability of OSM's FONSI and supplemental EA for the 2009 Trapper Mining Plan modification.  OSM's failure to provide notice of the availability of the supplemental EA and FONSI violates NEPA, 40 C.F.R. §§ 1501.4(e)(1); 1506.6., and the APA, 5 U.S.C. § 706(2)(A).

**Fourth Claim for Relief**
**Violation of NEPA with Respect to the 2009 Trapper Mining Plan Modification— Failure
to Take a Hard Look at the Direct and Indirect Impacts of Mining on Air Quality**

143.    Each and every allegation set forth in this complaint is incorporated herein by reference.

144.    OSM prepared a supplemental EA for the Trapper Mining Plan modification in 2009.  The EA supplemented six NEPA documents previously prepared by either OSM or BLM. The EA addressed impacts to wildlife and cultural resources from the Trapper Mining Plan modification.  The EA did not discuss direct and indirect impacts to air quality from the Trapper Mining Plan modification.

145.    Defendants failed to prepare a NEPA document that presented the requisite hard look at direct impacts to local air quality from the Trapper mine's $PM_{2.5}$ and ozone emissions. OSM's 2009 EA did not address impacts to air quality in light of the 2006 $PM_{2.5}$ standard and the 2008 ozone standard.

146.    Defendants failed to prepare a NEPA document that also presented the requisite hard look at indirect impacts to air and water quality associated with combustion of coal from the Trapper Mine.

147.    Because Defendants' approval of the 2009 Trapper Mining Plan modification failed to take a hard look at the direct and indirect impacts of mining, Defendants' approval was "arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law" and constitutes a violation of NEPA and the APA.  5 U.S.C. § 706(2)(A) and (D).

**Fifth Claim for Relief**
**Violation of NEPA with Respect to the 2012 Spring Creek Mining Plan**
**Modification—Failure to Provide Public Notice and Participation**

148.    Each and every allegation set forth in this complaint is incorporated herein by reference.

149.    Defendants approved the 2012 Spring Creek Mining Plan Modification as part of an ongoing patterns and practice of taking federal action on mining plan modifications in violation of NEPA's requirement that, to the fullest extent possible, all federal agencies are obligated to "[e]ncourage and facilitate public involvement in decisions which affect the quality of the human environment." 40 C.F.R. § 1500.2.

150.    Defendants did not provide notice to the public of the availability of OSM's FONSI and decision to rely on an EA prepared by BLM for the 2012 Spring Creek Mining Plan modification. OSM's failure to provide notice of the availability of the FONSI violates NEPA, 40 C.F.R. §§ 1501.4(e)(1); 1506.6., and the APA, 5 U.S.C. § 706(2)(A).

**Sixth Claim for Relief**
**Violation of NEPA with Respect to the 2012 Spring Creek Mining Plan Modification—**
**Failure to Take a Hard Look at the Direct and Indirect Impacts of Mining on Air Quality**

151.    Each and every allegation set forth in this complaint is incorporated herein by reference.

152.    OSM relied on a 2006 EA prepared by BLM to support its 2012 FONSI for the Spring Creek Mining Plan Modification. The EA did not discuss direct and indirect impacts to air quality from the Spring Creek Mining Plan modification.

153.    Defendants failed to prepare a NEPA document that presented the requisite hard look at direct impacts to local air quality from the Spring Creek mine's $PM_{2.5}$, ozone, and $NO_2$ emissions. The 2006 EA did not address impacts to air quality in light of the 2006 $PM_{2.5}$

standard, the 2008 ozone standard, and the 2010 $NO_2$ standard.  OSM did not issue its FONSI for

the Mine Plan modification until 2012—six years after EPA revised the $PM_{2.5}$ standard, four

years after EPA revised the ozone standard, and more than one year after EPA promulgated the

$NO_2$ standard.

154.    Defendants failed to prepare a NEPA document that also presented the requisite

hard look at indirect impacts to air and water quality associated with combustion of coal from the

Spring Creek Mine.

155.    Because Defendants' approval of the 2012 Spring Creek Mining Plan

modification failed to take a hard look at the direct and indirect impacts of mining, Defendants'

approval was "arbitrary and capricious, an abuse of discretion, and otherwise not in accordance

with law" and constitutes a violation of NEPA and the APA.  5 U.S.C. § 706(2)(A) and (D).

<u>**Seventh Claim for Relief**</u>
**Violation of NEPA with Respect to the 2008 San Juan Mining Plan Modification—Failure
to Provide Public Notice and Participation**

156.    Each and every allegation set forth in this complaint is incorporated herein by

reference.

157.    Defendants approved the 2008 San Juan Mining Plan Modification as part of an

ongoing patterns and practice of taking federal action on mining plan modifications in violation

of NEPA's requirement that, to the fullest extent possible, all federal agencies are obligated to

"[e]ncourage and facilitate public involvement in decisions which affect the quality of the human

environment."  40 C.F.R. § 1500.2.

158.    Defendants did not provide notice to the public of the availability of OSM's

FONSI and its decision to rely on a 1998 EA prepared by BLM and a 1999 New Mexico

permitting decision for the 2008 San Juan Mining Plan modification.  OSM's failure to provide

35

notice of the availability of the FONSI violates NEPA, 40 C.F.R. §§ 1501.4(e)(1); 1506.6., and

the APA, 5 U.S.C. § 706(2)(A).

**Eighth Claim for Relief**
**Violation of NEPA with Respect to the 2008 San Juan Mining Plan Modification—Failure**
**to Take a Hard Look at the Direct and Indirect Impacts of Mining on Air Quality**

159.    Each and every allegation set forth in this complaint is incorporated herein by

reference.

160.    OSM relied on a 1998 EA prepared by BLM and a 1999 New Mexico permit to

support its 2008 FONSI for the San Juan Mining Plan Modification.  Neither the EA nor the

permit considered direct and indirect impacts to air quality from the San Juan Mining Plan

modification.

161.    Defendants failed to prepare a NEPA document that presented the requisite hard

look at direct impacts to local air quality from the San Juan mine's $PM_{2.5}$ and ozone emissions.

The 1998 EA and the 1999 New Mexico permit did not address impacts to air quality in light of

the 2006 $PM_{2.5}$ standard and the 1997 ozone standard that was in effect at the time OSM

prepared its FONSI in 2008.

162.    Defendants failed to prepare a NEPA document that also presented the requisite

hard look at indirect impacts to air and water quality associated with combustion of coal from the

San Juan Mine.

163.    Because Defendants' approval of the 2008 San Juan Mining Plan modification

failed to take a hard look at the direct and indirect impacts of mining, Defendants' approval was

"arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law" and

constitutes a violation of NEPA and the APA.  5 U.S.C. § 706(2)(A) and (D).

### Ninth Claim for Relief
**Violation of NEPA with Respect to the 2010 School Creek Mining Plan—Failure to Provide Public Notice and Participation**

164.    Each and every allegation set forth in this complaint is incorporated herein by reference.

165.    Defendants approved the 2010 School Creek Mining Plan as part of an ongoing pattern and practice of taking federal action on mining plans and mining plan modifications in violation of NEPA's requirement that, to the fullest extent possible, all federal agencies are obligated to "[e]ncourage and facilitate public involvement in decisions which affect the quality of the human environment."  40 C.F.R. § 1500.2.

166.    Defendants did not provide notice to the public of the availability of OSM's FONSI and 2009 EA for the 2010 School Creek Mining Plan.  OSM's failure to provide notice of the availability of the FONSI and EA violates NEPA, 40 C.F.R. §§ 1501.4(e)(1); 1506.6., and the APA, 5 U.S.C. § 706(2)(A).

### Tenth Claim for Relief
**Violation of NEPA with Respect to the 2010 School Creek Mining Plan—Failure to Prepare an EIS**

167.    Each and every allegation set forth in this complaint is incorporated herein by reference.

168.    NEPA requires preparation of an EIS if a federal action has the potential to "significantly affect" the environment.  42 U.S.C. § 4332(2)(C) and 40 C.F.R. § 1501.4.

169.    According to the Department of Interior's Manual, OSM actions normally requiring an EIS include actions where "environmental impacts of the proposed mining operation are not adequately analyzed in an earlier environmental document covering the specific leases or mining activity," where "[t]he area to be mined is 1280 acres or more, or the annual full

production level is 5 million tons or more," and where "[m]ining and reclamation operations will occur for 15 years or more."  516 DM 13.4(A)(4).

170.     The area to be mined for the School Creek mine is 7,394 acres.  The proposed annual production level at School Creek is 40 million tons of coal.  Mining operations at School Creek will last for 21 years.

171.     Defendants' use of an EA/FONSI to approve the School Creek Mining Plan violates NEPA.

172.     Defendants' approval of the 2010 School Creek Mining Plan is a major federal action that that may significantly affect the quality of the human environment because mining activities will likely result in ozone, $PM_{2.5}$, and $NO_2$ emission levels that exceed federal air quality standards.

173.     Defendants' decision not to prepare an EIS before approving the 2010 School Creek Mining Plan was arbitrary and capricious, and in violation of NEPA and the APA, 5 U.S.C. § 706(2)(A).

### Eleventh Claim for Relief
**Violation of NEPA with Respect to the 2010 School Creek Mining Plan—Failure to Take a Hard Look at the Direct and Indirect Impacts of Mining on Air Quality**

174.     Each and every allegation set forth in this complaint is incorporated herein by reference.

175.     Defendants failed to prepare a NEPA document that presented the requisite hard look at direct impacts to local air quality from the School Creek mine's $PM_{2.5}$, ozone, and $NO_2$ emissions.  OSM's 2009 EA did not address impacts to air quality in light of the 2006 $PM_{2.5}$ standard, the 2008 ozone standard, and the 2010 $NO_2$ standard.  OSM did not issue a FONSI for the Mine Plan until October 2010—eight months after EPA promulgated the $NO_2$ standard.

176.    Defendants failed to prepare a NEPA document that also presented the requisite hard look at indirect impacts to air and water quality associated with combustion of coal from the School Creek Mine.

177.    Because Defendants' approval of the 2010 School Creek Mining Plan failed to take a hard look at the direct and indirect impacts of mining, Defendants' approval was "arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law" and constitutes a violation of NEPA and the APA.  5 U.S.C. § 706(2)(A) and (D).

**Twelfth Claim for Relief**
**Violation of NEPA with Respect to the 2011 Black Thunder Mining Plan Modification—**
**Failure to Provide Public Notice and Participation**

178.    Each and every allegation set forth in this complaint is incorporated herein by reference.

179.    Defendants approved the 2011 Black Thunder Mining Plan Modification as part of an ongoing pattern and practice of taking federal action on mining plan modifications in violation of NEPA's requirement that, to the fullest extent possible, all federal agencies are obligated to "[e]ncourage and facilitate public involvement in decisions which affect the quality of the human environment."  40 C.F.R. § 1500.2.

180.    Defendants did not provide notice to the public of the availability of OSM's Statement of NEPA Compliance for the 2011 Black Thunder Mining Plan Modification.  OSM's failure to provide notice of the availability of the Statement of NEPA Compliance violates NEPA, 40 C.F.R. §§ 1501.4(e)(1); 1506.6., and the APA, 5 U.S.C. § 706(2)(A).

**Thirteenth Claim for Relief**
**Violation of NEPA with Respect to the 2011 Black Thunder Mining Plan Modification—**
**Failure to Take a Hard Look at the Direct and Indirect Impacts of Mining on Air Quality**

181.    Each and every allegation set forth in this complaint is incorporated herein by reference.

182.    Defendants failed to prepare a NEPA document that presented the requisite hard look at direct impacts to local air quality from the Black Thunder mine's $PM_{2.5}$, ozone, and $NO_2$ emissions.  The 2003 and 2010 EISs did not address impacts to air quality in light of the 2006 $PM_{2.5}$ standard, the 2008 ozone standard, and the 2010 $NO_2$ standard.  OSM did not issue its Statement of NEPA Compliance for the Mine Plan until April 2011—more than one year after EPA promulgated the $NO_2$ standard.

183.    Defendants failed to prepare a NEPA document that also presented the requisite hard look at indirect impacts to air and water quality associated with combustion of coal from the Black Thunder Mine.

184.    Because Defendants' approval of the 2011 Black Thunder Mining Plan Modification failed to take a hard look at the direct and indirect impacts of mining, Defendants' approval was "arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law" and constitutes a violation of NEPA and the APA.  5 U.S.C. § 706(2)(A) and (D).

**Fourteenth Claim for Relief**
**Violation of NEPA with Respect to the 2012 Cordero Rojo Mining Plan Modification—**
**Failure to Provide Public Notice and Participation**

185.    Each and every allegation set forth in this complaint is incorporated herein by reference.

186.    Defendants approved the 2012 Cordero Rojo Mining Plan Modification as part of an ongoing pattern and practice of taking federal action on mining plan modifications in

violation of NEPA's requirement that, to the fullest extent possible, all federal agencies are obligated to "[e]ncourage and facilitate public involvement in decisions which affect the quality of the human environment."  40 C.F.R. § 1500.2.

187.    Defendants did not provide notice to the public of the availability of OSM's Statement of NEPA Compliance for the 2012 Cordero Rojo Mining Plan Modification.  OSM's failure to provide notice of the availability of the Statement of NEPA Compliance violates NEPA, 40 C.F.R. §§ 1501.4(e)(1); 1506.6., and the APA, 5 U.S.C. § 706(2)(A).

**Fifteenth Claim for Relief**
**Violation of NEPA with Respect to the 2012 Cordero Rojo Mining Plan Modification—**
**Failure to Take a Hard Look at the Direct and Indirect Impacts of Mining on Air Quality**

188.    Each and every allegation set forth in this complaint is incorporated herein by reference.

189.    Defendants failed to prepare a NEPA document that presented the requisite hard look at direct impacts to local air quality from the Cordero Rojo mine's $PM_{2.5}$, ozone, and $NO_2$ emissions.  The 2007 EIS did not address impacts to air quality in light of the 2006 $PM_{2.5}$ standard, the 2008 ozone standard, and the 2010 $NO_2$ standard.  OSM did not issue its Statement of NEPA Compliance for the Mine Plan until April 2012—four years after EPA revised the ozone standard and more than one year after EPA promulgated the $NO_2$ standard.

190.    Defendants failed to prepare a NEPA document that also presented the requisite hard look at indirect impacts to air and water quality associated with combustion of coal from the Cordero Rojo Mine.

191.    Because Defendants' approval of the 2012 Cordero Rojo Mining Plan Modification failed to take a hard look at the direct and indirect impacts of mining, Defendants'

approval was "arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law" and constitutes a violation of NEPA and the APA.  5 U.S.C. § 706(2)(A) and (D).

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A.   Declare that Defendants violated NEPA and the APA by approving the 2007 Colowyo Mining Plan modification;

B.   Void, reverse and remand Defendants' decision to approve the 2007 Colowyo Mining Plan modification;

C.   Declare that Defendants violated NEPA and the APA by approving the 2009 Trapper Mining Plan modification;

D.   Void reverse and remand Defendants' decision to approve the 2009 Trapper Mining Plan modification;

E.   Declare that Defendants violated NEPA and the APA by approving the 2012 Spring Creek Mining Plan modification;

F.   Void reverse and remand Defendants' decision to approve the 2012 Spring Creek Mining Plan modification;

G.   Declare that Defendants violated NEPA and the APA by approving the 2008 San Juan Mining Plan modification;

H.   Void reverse and remand Defendants' decision to approve the 2008 San Juan Mining Plan modification;

I.   Declare that Defendants violated NEPA and the APA by approving the 2010 School Creek Mining Plan;

J.      Void reverse and remand Defendants' decision to approve the 2010 School Creek

        Mining Plan;

K.      Declare that Defendants violated NEPA and the APA by approving the 2011

        Black Thunder Mining Plan modification;

L.      Void reverse and remand Defendants' decision to approve the 2011 Black

        Thunder Mining Plan modification;

M.      Declare that Defendants violated NEPA and the APA by approving the 2012

        Cordero Rojo Mining Plan modification;

N.      Void reverse and remand Defendants' decision to approve the 2012 Cordero Rojo

        Mining Plan modification;

O.      Enjoin Defendants from re-issuing the aforementioned Mining Plan approvals

        until such time as they have demonstrated compliance with NEPA and the APA;

P.      Enjoin operations at all of the aforementioned mines until such time as

        Defendants have demonstrated compliance with NEPA and the APA;

Q.      Grant Plaintiffs their costs of litigation including reasonable attorneys' fees as

        provided by the Equal Access to Justice Act, 28 U.S.C. § 2412; and

R.      Grants Plaintiffs such additional and further relief as the Court deems just and

        proper.

Respectfully submitted on this 27th day of February, 2013.


/s/ Samantha Ruscavage-Barz                /s/ James Jay Tutchton
NM Bar. No. 23276                          CO Bar No. 21138
WildEarth Guardians                        WildEarth Guardians
516 Alto Street                            6439 Maplewood Ave.
Santa Fe, NM 87501                         Centennial, CO 80111
(505) 988-9126 x1158                       (720) 301-3843
sruscavagebarz@wildearthguardians.org      jtutchton@wildearthguardians.org


*Attorneys for Plaintiff WildEarth Guardians*