# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

| | |
|---|---|
| WILDEARTH GUARDIANS, | CV 14-13-BLG-SPW-CSO |
| Plaintiff, | |
| vs. | **FINDINGS AND RECOMENDATIONS** |
| U.S. OFFICE OF SURFACE MINING, RECLAMATION AND ENFORCEMENT, AL KLEIN, in his official capacity as Western Regional Director of the Office of Surface Mining Reclamation and Enforcement, Denver, Colorado, and SALLY JEWELL, in her capacity as U.S. Secretary of the Interior, | |
| Defendants, | |
| and | |
| STATE OF MONTANA, SPRING CREEK COAL LLC, NATIONAL MINING ASSOCIATION, | |
| Defendant-Intervenors. | |
| NORTHERN PLAINS RESOURCE COUNCIL INC., WESTERN ORGANIZATION OF RESOURCE COUNCILS INC, | CV 14-103-BLG-SPW-CSO |
| Plaintiffs, | |
| vs. | |

SALLY JEWELL, in her official
capacity as U.S. Secretary of the
Interior, U.S. OFFICE OF SURFACE
MINING RECLAMATION AND
ENFORCEMENT,

                   Defendants,
    and

STATE OF MONTANA, SPRING
CREEK COAL LLC, NATIONAL
MINING ASSOCIATION,

              Defendant-Intervenors.

      This action arises from the Office of Surface Mining Reclamation
and Enforcement's ("OSM") approval of a mining plan modification for
the Spring Creek Mine in Montana. This agency decision gave rise to
two actions in this court: (1) *Northern Plains Resource Council et al. v.
Jewell et al. ("NPRC")*, No. CV-14-103-BLG-SPW-CSO (D. Mont. Aug.
14, 2014), and (2) *WildEarth Guardians v. U.S. Office of Surface Mining,
Reclamation and Enforcement, et al.*, No. CV 14-13-BLG-SPW-CSO (D.
Mont. Feb. 27, 2013). These actions have been consolidated with the
consent of the parties. *ECF 70.*

      The following motions are pending:

(1)    Motion for Summary Judgment filed by Plaintiffs Northern
        Plains Resource Council, Inc. and Western Organization of
        Resource Councils, Inc. (collectively "NPRC") (*ECF 76*),

(2) Motion for Summary Judgment filed by Plaintiff WildEarth Guardians ("WildEarth") (*ECF 78*),

(3) Motion for Summary Judgment filed by Defendant-Intervenor State of Montana ("State") (*ECF 89*),

(4) Cross Motion for Summary Judgment filed by Defendant-Intervenors Spring Creek Coal LLC ("SCC") and the National Mining Association (*ECF 93*), and

(5) Federal Defendant's[1] Cross-Motion for Summary Judgment (*ECF 97*).

## I.    BACKGROUND

### A.    PROCEDURAL

WildEarth's claims against Federal Defendants were first asserted in the District of Colorado, along with challenges to other mine plan decisions regarding other mines in various states.  The United States District Court for the District of Colorado severed the claims related to the Spring Creek Mine and transferred them to this Court on February 10, 2014.  *ECF 32.*  Spring Creek Coal LLC, the National Mining

---

[1] The Federal Defendants named in these two actions include: U.S. Office of Surface Mining, Reclamation and Enforcement; Al Klein, in his official capacity as Western Regional Director of the Office of Surface Mining Reclamation and Enforcement; and Sally Jewell, in her capacity as U.S. Secretary of the Interior.

Association, and the State of Montana moved to intervene. Their motions were granted by this Court. *ECF 49, 58, 60.*

Following briefing of the pending summary judgment motions, the Court conducted a hearing on the motions. *ECF 120.* At the conclusion of the hearing, the court agreed to allow the parties 60 days to attempt settlement. This period was later extended at the request of the parties. *ECF 126.* Having been advised that settlement attempts were unsuccessful (*ECF 127*), the Court enters these Findings and Recommendations to the presiding judge, rather than endorsing additional delay through further briefing or hearing.

**B.    FACTS**

The Spring Creek Mine is a surface coal mine located in Big Horn County, Montana. It is situated in the northwest portion of Montana's Powder River Basin, which contains large reserves of fossil fuels including coal. *ECF 97-2* at 2. Mining operations began at the Spring Creek Mine in 1980. *ECF 97-3* at 4. Approximately two hundred and eighty (280) people are now employed at the mine. *Tr. of Hearing (ECF 123)* ("Tr.") *at 106.*

In 2005, SCC[2] filed an application to lease an additional 1207.5 acres of federal coal in order to extend the life of the Spring Creek Mine. *SPRING CREEK_000027, ("AR") et seq.*[3] After determining that the lease application met the regulatory requirements, the Bureau of Land Management ("BLM") prepared an Environmental Assessment ("EA"), designating the additional tracts as case file number MTM 94378. OSM was a cooperating agency in completing this EA. *AR 16.* After completing the EA, the BLM issued the lease to SCC, effective December 1, 2007. *AR 5360–5362.* With respect to additional mining operations, BLM's EA explained:

> The BLM does not authorize mining operations by
> issuing a lease. After a lease has been issued but
> prior to mine development, the lessee must file a
> permit application package with the MDEQ [Montana
> Department of Environmental Quality] and
> Office of Surface Mining Reclamation and
> Enforcement (OSM) for a surface mining
> permit and approval of the Mineral Leasing Act of

---

[2] The Spring Creek Mine is owned and operated by Spring Creek Coal LLC, which is a wholly owned subsidiary of NERCO Coal LLC. The stock of NERCO Coal LLC is ultimately held by Cloud Peak Energy, Inc. ("Cloud Peak"). Spring Creek Coal LLC was formally known as Spring Creek Coal Company. *ECF 97-3* at 4–5.

[3] Federal Defendants have produced the Administrative Record ("AR"), which has been Bates stamped SPRING CREEK_000001 through SPRING CREEK_005625, with copies provided to the Court and all counsel of record. When referring to the AR, the Court will cite to the Bates stamped pages.

1920 (MLA) mining plan. An analysis of a
detailed site-specific mining and reclamation plan
occurs at that time.

*AR 27.*

Accordingly, in 2008, SCC submitted a permit application to

extend coal mining onto this lease. *ECF 95 at 4.* Spring Creek revised

the permit application several times in response to comments from

MDEQ. *Id.* MDEQ approved the permit to expand the Spring Creek

Mine on June 23, 2011. *Id. at 5.*

On June 5, 2012, OSM issued a one-page Finding of No Significant

Impact for the mining plan modification allowing recovery of coal from

Federal Lease MTM94378. The reasons for this finding were stated in

one sentence, without further explanation or elaboration:

> The finding of no significant impact is based on the attached
> Environmental Assessment: *Environmental Assessment for Spring
> Creek Coal Lease by Application, MTM,94378 (November 2006)*
> prepared by the Bureau of Land Management with the MDEQ and
> OSM as cooperating agencies which has been independently
> evaluated by OSM and determined to assess the environmental
> impacts of the proposed action adequately and accurately and to
> provide sufficient evidence and analysis for this finding of no
> significant impact.

*AR 16.* On June 12, 2012, the OSM Regional Director recommended

that the OSM Director approve the mining plan modification. *AR 4–11.*

With respect to the environmental analysis, this document stated:

> I have determined that approval of this mining plan modification will not have a significant impact on the quality of the human environment. The environmental analysis entitled ENVIRONMENTAL ASSESSMENT FOR SPRING CREEK COAL LEASE MODIFICATION MTM94378 (November 2006) prepared by BLM with OSM as a cooperating agency and other environmental documents noted in the Finding of No Significant Impact (FONSI), describe the impacts that may result from approval of this mining plan modification and its alternatives.

*AR 10.* Despite the representation above, no "environmental documents" other than the 2006 EA were noted in the 2012 FONSI.

On June 26, 2012, the Director of OSM recommended to the Acting Assistant Secretary for Land and Minerals Management that the proposed mining plan modification be approved. *AR 3.* On June 27, 2012, the Assistant Secretary of the Interior approved the mining plan modification. *AR 191–198.*

The mining plan amendment extended surface coal mining operations onto federal lease MTM 94378 for the first time. The expansion: (1) increases the permit area by 2,042 acres, to a total of 9,103 acres; (2) increases surface disturbance at the mine by 1,224 acres; (3) increases the number of acres of federal coal mined to 1,118; (4) adds an additional 117 million tons of federal coal; and (5) extends the mine's life by an additional 10.9 years, through 2022. *See AR 8; ECF 91 at 6, 97 at 14–15.*

## II.   PARTIES' ARGUMENTS

Collectively, the Plaintiffs argue that the approval of the Mining Plan Amendment violated the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, because OSM failed to provide notice of its FONSI to the public and it failed to take the requisite hard look as required by NEPA.  *ECF 76*-1 at 8; *ECF 78-1* at 9.

More specifically, NPRC argues that: (1) the U.S. Secretary of the Interior ("Secretary") failed to provide public notice of the decision to approve the mining plan amendment and failed to provide an opportunity for public participation in the NEPA process; and (2) the Secretary failed to take the required "hard look" at the impacts of the mining plan expansion to land and water resources by authorizing the mine expansion in light of the mine's failure to achieve successful, contemporaneous reclamation in the past, and by relying on an outdated EA in approving the expansion. *ECF 22–34*.

WildEarth argues that OSM failed to provide notice of its decision or an opportunity for public involvement in the NEPA process, *ECF 78-1* at 17–21, and failed to take a hard look at the direct impacts to air quality from mine expansion by:  (1) not assessing whether any changes

affecting air quality had occurred in the intervening years, *id.* at 22–25; (2) not analyzing air quality impacts under NEPA distinct from the State, *id.* at 25–27; and (3) failing to supplement the EA's air quality analysis to consider new standards from $PM_{2.5}$ emissions,[4] ozone emissions, and nitrogen dioxide ("$NO_2$") emissions, *id.* at 27–32. Finally, WildEarth argues that OSM failed to take a hard look at indirect impacts to air quality from coal combustion. *Id.* at 32–35.

In support of their motion for summary judgment, the Federal Defendants argue that Plaintiffs' air quality and reclamation claims are waived because WildEarth did not alert the agency to its air quality concerns and NPRC did not alert the agency to its concerns until filing this action. *ECF* 97 at 20–24. They argue that Plaintiffs could have taken steps to participate in the proceedings but, by failing to do so, they waived their air quality and reclamation claims. *Id.* at 24.

Next, Federal Defendants argue that Plaintiffs' claims lack merit because: (1) Federal Defendants complied with NEPA's public participation requirements because there was no obligation to circulate its FONSI for comments and circumstances here do not trigger any requirement to formally notify the public, *id.* at 24–28, 44–46; (2) NEPA

---

[4] Particulate matter less than 10 microns in diameter ("$PM_{2.5}$").

does not require analysis of combustion impacts because it is too speculative and beyond the scope of the agency's responsibilities, *id.* at 28–33; (3) OSM's analysis of air quality impacts is adequate, *id.* at 33–39; and (4) the EA's consideration of reclamation issues was adequate and Plaintiffs misstate actual progress of reclamation and failed to identify any reclamation violations. *Id.* at 39–42.

Defendant-Intervenors add that: (1) WildEarth fails to recognize that OSM's obligations are circumscribed by other legal requirements governing the development of federally leased coal, *id.* at 26–27; and (2) a change in environmental laws, such as National Ambient Air Quality Standards ("NAAQS"), does not require a new NEPA review because the standards do not constitute new information, nor do they provide a seriously different picture of the environmental landscape, as would require supplementation. *Id.* at 33.

Regarding Plaintiffs' contemporaneous reclamation argument, the State argues that bond release status is not an accurate indicator for evaluating the success of contemporaneous reclamation, nor do Plaintiffs correctly state how such reclamation is measured, and that the EA thoroughly considered the impacts of reclamation. *ECF 89*, 14–17.

In response, WildEarth argues that it did not waive its claims because there are no statutory exhaustion requirements in NEPA and because OSM provided no opportunity for participation in its NEPA process. *ECF 100* at 22–24.

NPRC argues that the Secretary's decision to shut out impacted local communities and then suggest that the same communities have "waived" their ability to raise and protest legitimate concerns is capricious and arbitrary. *ECF 101* at 9.

### III.  STANDARD OF REVIEW

The Administrative Procedure Act ("APA") provides the authority for a court's review of agency decisions under NEPA. 5 U.S.C. §§ 701 *et seq.*; *Barnes v. U.S. Dept. of Transp.*, 655 F.3d 1124, 1132 (9th Cir. 2011). Under the APA, a court may set aside an agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Barnes*, 655 F.3d at 1132 (quoting 5 U.S.C. § 706(2)(A)). In APA actions, the court's review is based on the agency's administrative record. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883-84 (1990).

Under this standard, the court's role is to determine whether the agency's record supports the agency's decision as a matter of law. An

agency decision is arbitrary and capricious where it "relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency [at the time of its decision] or is so implausible that it could not be ascribed to a difference in view of the product of agency expertise." *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008).

A review of an agency's decision not to prepare an EIS requires a court to "determine whether the agency has taken a 'hard look' at the consequences of its actions, 'based [its decision] on consideration of the relevant factors,' and provided a 'convincing statement of reasons to explain why a project's impacts are insignificant." *Id.* (quoting *Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1009 (9th Cir.2006)).

## IV.  **DISCUSSION**

NEPA is "our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a).  It establishes "a 'national policy [to] encourage productive and enjoyable harmony between man and his environment,' and was intended to reduce or eliminate environmental damage and promote 'the understanding of the ecological systems and

natural resources important to' the United States." *Dept. of Transp. v. Public Citizen*, 541 U.S. 752, 756–757 (2004) (quoting 42 U.S.C. § 4321).

NEPA is a procedural statute that does not "mandate particular results but simply provides the necessary process to insure that federal agencies take a hard look at the environmental consequences of their actions." *High Sierra Hikers Ass'n v. Blackwell,* 390 F.3d 630, 639–40 (9th Cir. 2004) (internal citations omitted); *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 351 (1989) (NEPA "prohibits uninformed—rather than unwise—agency action"). NEPA requires government agencies to "consider every significant aspect of the environmental impact of a proposed action." *Baltimore Gas & Elec. Co. v. NRDC,* 462 U.S. 87, 97 (1983). NEPA also requires that relevant information be made available to the public so that they "may also play a role in both the decision making process and the implementation of that decision." *Robertson,* 490 U.S. at 349.

While courts must "strictly interpret the procedural requirements in NEPA and the CEQ [Counsel of Environmental Quality] regulations," *Churchill County v. Norton*, 276 F.3d 1060, 1071 (9th Cir.2001), courts must "be mindful to defer to agency expertise, particularly with respect to scientific matters within the purview of the agency." *Klamath–*

*Siskiyou Wildlands Center v. Bureau of Land Mgt.*, 387 F.3d 989, 993

(9th Cir. 2004) (*internal citations omitted*.)  The standard of review is

"highly deferential" and the courts must defer to an agency's decision

that is "fully informed and well-considered", being careful not to

substitute the court's judgment for that of the agency experts.  *Blue*

*Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1211 (9th

Cir. 1998).  *See also Greenpeace Action v. Franklin,* 14 F.3d 1324, 1332

(9th Cir. 1993).

### A.    APPLICABLE DOI STATUTES AND REGULATIONS

The Mineral Leasing Act authorizes the Secretary to manage the

leasing of public lands for developing deposits of coal and other minerals.

*See generally* 30 U.S.C. §§ 181-287; 42 U.S.C. §§ 1701-1787.  Prior to

taking any action on a leasehold which might cause a significant

disturbance of the environment, a coal lessee must submit for the

Secretary's approval an operation and reclamation plan.  30 U.S.C §

207(c).

The Surface Mining Control and Reclamation Act, 30 U.S.C. §§

1201 *et seq.*, requires that environmental impacts from surface mining

be minimized and that mined lands be fully reclaimed.  The Department

of Interior has adopted comprehensive regulations to accomplish these goals. *See* 30 C.F.R. §§ 700 *et seq.* Although the regulations contemplate a system of cooperative federalism, the Secretary may not delegate to any State authority to approve mining plans or modifications thereto, nor may the Secretary delegate to any State the authority to comply with NEPA. 30 C.F.R. § 745.13(b), (i). Even if a state has a cooperative agreement with the Secretary regarding surface coal mining, approval of a mining plan or a mining plan modification remains with the Secretary and is not delegable. 30 U.S.C. § 1273(c) ("Nothing in this subsection shall be construed as authorizing the Secretary to delegate to the States his duty to approve mining plans on Federal Lands…."). Prior to the Secretary's decision on mining plan applications, OSM prepares and submits a decision document recommending approval, disapproval, or conditional approval of the mining plan. 30 C.F.R. § 746.13.

The Council of Environmental Quality ("CEQ") regulations allow the preparation of an EA, a more limited document than an EIS, if the agency makes a finding of no significant impact. 40 C.F.R. § 1501.4(e). The EA is to be a concise public document that briefly provides

"sufficient evidence and analysis for determining whether to prepare an [EIS] or a [FONSI]." 40 C.F.R. § 1508.9(a). A FONSI should briefly describe why the action will not have a significant effect on the human environment. It must include the environmental assessment or a summary of it and must note any other documents related to it. 40 C.F.R. § 1508.13. *See Public Citizen*, 541 U.S. at 757–58. An EA and associated FONSI must be made available to the affected public. 40 C.F.R. §§ 1501.4(e)(1), 1506.6(b); 43 C.F.R. § 46.305(c).

An agency may prepare an EA "to decide whether the environmental impact of a proposed action is significant enough to warrant preparation of an EIS." *Blue Mountains Biodiversity Project*, 161 F.3d at 1212 (*quoting* 40 C.F.R. § 1508.9). EAs may "tier" to earlier NEPA documents, but tiering does not eliminate the need to "summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference," concentrating "on the issues specific to the subsequent action." 40 C.F.R. §§ 1502.20, 1508.28. When existing environmental analyses prepared pursuant to NEPA and CEQ regulations are used in their entirety, the "supporting record must include an evaluation of whether new circumstances, new

information or changes in the action or its impacts not previously analyzed may result in significantly different environmental effects." 43 C.F.R. § 46.120(c). *See also Western Watersheds Project v. Lueders*, 2015 WL 4773871 (D. Nev. Aug. 13, 2015) (holding EA sufficient where BLM did not simply tier to previous plans, but also discussed "past, present, and reasonably foreseeable future actions" in its EA and "implemented specific mitigation methods to be utilized"). When using tiered documents, the agency must "include a finding that the conditions and environmental effects described in the broader NEPA document are still valid or address any exceptions." 43 C.F.R. § 46.140.

## B. <u>FEDERAL DEFENDANTS FAILED TO GIVE REQUIRED PUBLIC NOTICE</u>

NEPA procedures ensure that the agency will "inform the public that it has indeed considered environmental concerns in its decision making process." *Baltimore Gas and Elec. Co.*, 462 U.S. at 97. CEQ regulations require public involvement to the extent practicable in preparing an EA. 40 C.F.R. § 1501.4(b). The Department of Interior's regulations require that a bureau or office within the Department "notify the public of the availability of an environmental assessment and any associated [FONSI] once they have been completed." 43 C.F.R. §§

46.30, 46.305(c). Although the Ninth Circuit has "not established a minimum level of public comment and participation required by the regulations governing the EA and FONSI process," it has found that "a complete failure to involve or even inform the public about an agency's preparation of an EA and a FONSI" violates these regulations. *Citizens for Better Forestry v. U.S. Dept. of Agric.*, 341 F.3d 961, 970 (9th Cir. 2003). "An agency, when preparing an EA, must provide the public with sufficient environmental information, considered in the totality of circumstances, to permit members of the public to weigh in with their views and thus inform the agency decision-making process." *Bering Strait Citizens for Responsible Resource Dev. v. U.S. Army Corps of Engineers*, 524 F.3d 938, 953 (9th Cir. 2008).

The administrative record here includes no suggestion of public notice by the Federal Defendants of the FONSI. Although the Federal Defendants argue that they placed the documents in a reading room in a Denver high-rise office building (*ECF 97* at 18), they acknowledge that they gave the public no notice that the document had been placed there. And, as counsel for the Federal Defendants acknowledged at the hearing, there is no indication in the Administrative Record that the FONSI actually was placed in a reading room in Denver. *Tr. at 130.*

This contention is merely asserted, without citation, in the Defendants' briefs. *See ECF 97* at 18.

OSM made no effort to inform or involve the public in its decisions at issue. No notice was provided to the public regarding the existence of the FONSI, nor any notice indicating that it was placed in a reading room for public review. Under the applicable standards, the Court finds that this complete lack of notice violates the public participation and notice provisions of NEPA, and thus the Court recommends that Plaintiffs' motions be granted based on a lack of public notice.

## C. <u>FEDERAL DEFENDANTS FAILED TO TAKE THE REQUIRED "HARD LOOK"</u>

As noted, if an agency decides that an EIS is not necessary based on an EA, the agency must issue a FONSI to briefly present the reasons why the proposed agency action will not have a significant impact on the environment. *Public Citizen*, 541 U.S. at 757–758. In reviewing a decision not to prepare an EIS, courts determine, under the arbitrary and capricious standard, "'whether the agency has taken a 'hard look' at the consequences of its actions, based [its decision] on a consideration of the relevant factors, and provided a convincing statement of reasons to explain why a project's impacts are insignificant.'" *In Def. of Animals,*

*Dreamcatcher Wild Horse and Burro Sanctuary v. U.S. Dept. of Int.*, 751 F.3d 1054, 1068 (9th Cir. 2014) (quoting *Envtl. Prot. Info. Ctr.*, 451 F.3d at 1009).

Plaintiffs argue that OSM failed to analyze the mine expansion's effects on air quality, coal combustion, or reclamation. Because the FONSI itself fails to explain how OSM, in 2012, gave a hard look at the consequences of approving the mining plan amendment, the Court must agree. The FONSI, without any elaboration or explanation, simply states only the conclusion that it is based on the 2006 EA, which "has been independently evaluated by OSM and determined to assess the environmental impacts of the proposed action adequately and accurately and to provide sufficient evidence and analysis for this finding of no significant impact." *AR 16.* It does not explain, for example, why a six-year-old document can be exclusively relied upon in this regard, particularly when that earlier document expressly stated that it was not analyzing site-specific mining or reclamation plans. *See supra at 4-5.*

Applying the applicable standards, the Court concludes that such conclusory statements do not comply with governing laws and regulations summarized above. Although the 2006 EA was attached to the FONSI, there is no indication as to why and how an EA created

before the mining plan amendment application was filed properly analyzes its effects. Based on the lack of the required non-delegable environmental analysis in the NEPA documents at issue here, the Court recommends that Plaintiffs' motions be granted to the extent that they argue OSM failed to take a hard look under NEPA at their recommended approval of the SCC mining plan amendment.

### D. **WAIVER**

Defendants and Intervenors argue that Plaintiffs' did not alert the agency to its concerns early enough to provide a meaningful opportunity to rectify the alleged violations. *ECF 97* at 21; *ECF 93-1* at 24; *ECF 89* at 18.

In *Department of Transportation v. Public Citizen*, the Court highlighted the general principle that anyone challenging an agency's compliance with NEPA "must 'structure their participation so that it . . . alerts the agency to the [parties'] position and contentions' in order to allow the agency to give the issue meaningful consideration." 541 U.S. at 764 (quoting *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 553 (1978)). The Ninth Circuit, however, has "declined to adopt a broad rule which would require participation in agency proceedings as a condition precedent to seeking

judicial review of an agency decision." *Ilio'ulaokalani Coalition v. Rumsfeld*, 464 F.3d 1083, 1092 (9th Cir. 2006) (internal quotations omitted). In *Illio'ulaokalani Coalition*, the court emphasizes the primary responsibility for NEPA compliance remains with the agency and that "an EA's or EIS' flaws might be so obvious that there is no need for a commentator to point them out specifically in order to preserve its ability to challenge a proposed action." *Id.* (quoting *Public Citizen*, 541 U.S. at 765).

Here, Plaintiffs could not waive their objections where the Federal Defendants failed to inform the public of its NEPA process. Though the Plaintiffs' arguments, if made at an earlier stage of the proceedings to either the State or to BLM, might have alerted OSM to their concerns, Plaintiffs cannot have waived claims against these Federal Defendants that they were not able to bring earlier due to a lack of public notice. Thus, the Court recommends that the Defendants' waiver argument be denied.

### E.    REMEDY

Having found Federal Defendants in violation of NEPA, it is necessary to determine the appropriate remedy. The Plaintiffs' Complaints each request the Court to vacate the mining plan approval

pending Federal Defendants' compliance with NEPA. *ECF 40* at 19–21; *NPRC*, No. CV-14-103-BLG-SPW-CSO, *ECF 1*. SCC is prohibited from operating without a mining plan approval, so mine operations would have to be suspended pending NEPA compliance.[5]

While vacating the mining plan approval is an available remedy under the APA, a court is not required to vacate every unlawful agency action. *Natl. Wildlife Federation v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995). Because a remedy is controlled by principles of equity, a court may remand without vacatur to allow the agency action to remain in force until the action can be considered or replaced. *Humane Soc. of U.S. v. Locke*, 626 F.3d 1040, 1053 n.7 (9th Cir. 2010). To determine whether a procedurally invalid agency decision should be left in place or vacated, the Ninth Circuit has found that courts should consider "how serious the agency's errors are and the disruptive consequences of an interim change that may itself be changed." *California Communities Against Toxics v. U.S. E.P.A.*, 688 F.3d 989, 992 (9th Cir. 2012) (internal quotation omitted).

---

[5] At the hearing, counsel for NPRC appeared to amend this position by stating: "It is not the intention of my clients to shut down this mine operation. Tr. at 119.

The Secretary's decision to approve the mining plan amendment at issue here was the result of a long application process involving multiple state and federal agencies. A vacatur at this point, seven years after the initial application for the mining plan amendment was filed and three years after its approval, would have detrimental consequences for SCC and its employees, for the State of Montana, and for other agencies involved in this process. *See, e.g., Tr. at 106-109.* Not only production at the mine, but also reclamation and remediation efforts, would come to a halt. Additionally, a vacatur may result in duplication of efforts regarding the State permitting process, which was accomplished in what appears to be a correct and thorough manner, with proper notice. Equity warrants a decision to allow the mining plan amendment approval to remain in force, provided that Federal Defendants must correct the errors in its NEPA process.

Based on the circumstances of this case, the Court recommends that vacatur be deferred for a period of 180 days from the date of a final order on the pending motions for summary judgment. The Court further recommends that Federal Defendants, during this time period, be required to correct the NEPA violations by preparing an updated environmental assessment, taking a hard look at the direct and indirect

environmental effects of the SSC mining plan amendment, and complying with applicable public notice and participation requirements. *See Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1225 (9th Cir. 2008) ("If … an EA is so procedurally flawed that we cannot determine whether the proposed rule or project may have a significant effect, the court should remand for the preparation of a new EA"). *See also Wildearth Guardians v. U.S. Office of Surface Mining, Reclamation and Enforcement, et al.,* 2015 WL 2207834 (D. Colo. May 8, 2015) (remanding case to OSM to take a hard looks at environmental effects of mining plan revision and to provide public notice and opportunity for public involvement before reaching its decisions).

The Court additionally recommends that Plaintiffs be awarded reasonable attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412, because there are no special circumstances here to make such an award unjust, and because the position of the Federal Defendants was not substantially justified.

## V.   <u>CONCLUSION</u>

Based on the foregoing, IT IS RECOMMENDED that Defendants' and Defendant-Intervenors' summary judgment motions (*ECF 97*, *93*,

and *89*) be DENIED, and Plaintiffs' summary judgment motions (*ECF 76* and *78*) be GRANTED in part, as set forth herein.

NOW, THEREFORE, IT IS ORDERED that the Clerk shall serve a copy of the Findings and Recommendations of United States Magistrate Judge upon the parties. The parties are advised that pursuant to 28 U.S.C. § 636, any objections to the findings and recommendations must be filed with the Clerk of Court and copies served on opposing counsel within fourteen (14) days after entry hereof, or objection is waived.

DATED this 23rd day of October, 2015.

/s/ *Carolyn S. Ostby*
United States Magistrate Judge